## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
Center for Public Integrity,                )
                                             )
    Plaintiff,                          )
                                             )
               v.                   )    Civil No. 1:15-cv-01314 (APM)
                                             )
U.S. Department of Energy,                   )
                                             )
    Defendant.                          )
_____ )

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Center for Public Integrity brought this Freedom of Information Act ("FOIA")

action against Defendant Department of Energy ("DOE"), seeking to compel disclosure of records

concerning DOE's investigation of Sandia Corporation ("Sandia") and its lobbying activities.

Sandia is a government contractor that operates the Sandia National Laboratory, a government-

owned nuclear laboratory overseen by DOE.  In 2009, certain employees of Sandia and its parent

company, Lockheed Martin Corporation, devised a plan to lobby federal officials to renew

Sandia's contract with DOE without competitive bidding.  That plan, however, was developed and

carried out with the use of taxpayer funds.  DOE's Office of Inspector General investigated

Sandia's actions and concluded that it had violated federal laws prohibiting the use of taxpayer

dollars for lobbying activities.  Sandia eventually reached a civil settlement with the

U.S. Department of Justice.

In response to Plaintiff's FOIA request, DOE produced some records in full, some in part,

and withheld others in their entirety under certain statutory exemptions.  Plaintiff challenges

Defendant's reliance on those exemptions. Before the court are the parties' cross-motions for summary judgment. Defendant contends that it properly withheld information under FOIA Exemptions 3, 4, 6, 7(C), 7(E), and 7(F), as that information consists of a combination of sensitive national security information, documents implicating personal privacy interests, as well as several confidential and legally privileged proprietary business documents. Plaintiff argues that Defendant's withholding of responsive records is unjustified.

The Court finds Defendant properly withheld information under Exemptions 3, 7(E), and 7(F), as well as certain information under Exemptions 4, 6, and 7(C). However, the court also finds that Defendant has not properly justified withholding other information under Exemptions 4, 6, and 7(C). As to that information, the court will not order its disclosure at this time, but will give Defendant the opportunity to supplement its declarations. Accordingly, the court grants in part and denies in part Defendant's Motions for Summary Judgment and denies in part Plaintiff's Motion for Summary Judgment.

## II. BACKGROUND

### A. DOE's Investigation into Sandia Corporation's Lobbying Activities

Sandia Corporation ("Sandia"), a wholly-owned subsidiary of Lockheed Martin Corporation, operates Sandia National Laboratory, which is one of three government-owned national security nuclear laboratories falling under the auspices of the U.S. Department of Energy ("DOE") and its sub-component, the National Nuclear Security Administration ("NNSA"). Sandia originally contracted with Defendant to operate the nuclear laboratory in 1993. *See* Def.'s Second Mot. for Partial Summ. J., ECF No. 26 [hereinafter NNSA Mot.], Ex. 1, ECF No. 26-1 [hereinafter Eanes Decl.], ¶ 2; Pl.'s Opp'n to Def.'s Mots. for Summ. J., ECF No. 30 [hereinafter Pl.'s Opp'n], at 2. Sandia was annually paid $2 billion under the contract. Pl.'s Opp'n at 2.

Sandia's contract with DOE was set to expire in 2012.  In or around 2009, executives from both Lockheed Martin and Sandia formed an internal team tasked with formulating a lobbying strategy for obtaining a no-bid contract extension.  *Id.*  As part of its strategy, Sandia hired three lobbying consultants who worked closely with Lockheed and Sandia employees in order to, among other things, identify specific individuals—including government officials and members of Congress—to target in an effort to obtain the no-bid extension.  *Id.*

At some point, these lobbying activities came to the attention of DOE's Office of Inspector General ("OIG").  Following an investigation, OIG issued a report in November 2014, finding that Sandia had used taxpayer funds to engage in lobbying activities in violation of federal law.  *Id.* at 2–3; Def.'s First Partial Mot. for Summ. J., ECF No. 22 [hereinafter DOE Mot.], Ex. 2, ECF No. 22-2, at 7–35.  On August 20, 2015, Sandia reached an agreement with the U.S. Department of Justice to pay $4,790,042 to resolve the alleged law violations.  Pl.'s Opp'n at 3–4.

**B.      Plaintiff's FOIA Request**

On November 12, 2014, Plaintiff Center for Public Integrity submitted a FOIA request to DOE, seeking:

- "A full copy of the Report of Investigation, the Final Report, the Closing Memo, the Referral Letter, and the Referral Memo for Department of Energy Office of Inspector General Investigation DOE/IG-0927;" and

- "All records in your custody or under your control that pertain to Department of Energy Office of Inspector General investigation DOE/IG-0927, including but not limited to letters, e-mails, memoranda, reports, appointment calendars, and telephone call logs and any related attachments, and dated up until the date you process this request."

Pl.'s Opp'n, Ex. 1, ECF No. 30-1, at 1.

OIG subsequently identified a total of 114 documents that were responsive to Plaintiff's FOIA request, which it then reviewed for release.  DOE Mot. at 3–4.  Ultimately, OIG released 71

documents—27 documents in full, 44 with redactions—and withheld two documents in their entirety. *Id*.  OIG invoked Exemptions 5, 6, and 7(C) to justify its various redactions and withholdings.[1] *Id*.

Additionally, OIG forwarded 41 documents contained in the investigative file to the NNSA for its review prior to release. *Id*.  NNSA, along with Sandia staff and other administrative agencies, reviewed and ultimately produced 39 documents with redactions.  NNSA Mot. at 1–3. NNSA invoked FOIA Exemptions 3, 4, 6, 7(E), and 7(F) to justify the various redactions. *Id*.[2]

After exhausting its administrative remedies, Plaintiff filed this action on August 13, 2015. Compl., ECF No. 1.  The matter is now before the court on the parties' cross-motions for summary judgment.

## III.   STANDARD OF REVIEW

Most FOIA cases are appropriately resolved on motions for summary judgment. *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Unlike the review of other agency action that must be

---

[1] Plaintiff failed to respond to Defendant's arguments supporting the invocation of Exemption 5 to withhold drafts of the OIG Report.  Thus, the court will treat those arguments as conceded. *See Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party responds to some but not all arguments raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded.").  Moreover, the court is convinced, in light of the evidence submitted and controlling authority, that Defendant has carried its burden as to those records. *See National Sec. Archive v. CIA*, 752 F.3d 460, 462–63 (D.C. Cir. 2014); *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258–59 (D.C. Cir. 1982).

[2] Defendant initially withheld certain information from NNSA pursuant to Exemption 5, but produced it after Plaintiff filed its Opposition. *See* Def.'s Reply in Supp. of Partial Mots. for Summ. J., ECF No. 33, at 3.  Thus, Defendant's assertion of Exemption 5 as to those records is no longer before the court.

upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"   *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

Summary judgment in a FOIA case may be based solely on information provided in an agency's supporting affidavits or declarations if they are "relatively detailed and non-conclusory." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted).   The agency's affidavits or declarations must "describe the documents and the justifications for nondisclosure with reasonably specific detail" and "demonstrate that the information withheld logically falls within the claimed exemption." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).   Further, they must not be "controverted by either contrary evidence in the record [or] by evidence of agency bad faith." *Id.*; *see Beltranena v. Clinton*, 770 F. Supp. 2d 175, 181–82 (D.D.C. 2011).   "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

## IV.   DISCUSSION

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).   Because of FOIA's critical role in promoting transparency and accountability, "[a]t all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'" *Nat'l Ass'n of Home*

*Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).   FOIA requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions, *see* 5 U.S.C. § 552(b); *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973).   "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."   *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (internal quotation marks omitted).

Defendant invokes FOIA Exemptions 3, 4, 6, 7(C), 7(E), and 7(F) to justify its various redactions.   Plaintiff challenges the applicability of the cited exemptions.   The court addresses each of the parties' disputes below, starting with their contest over Exemption 4.

## A.      Exemption 4

Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information [that is] obtained from a person [and is] privileged or confidential."   5 U.S.C. § 552(b)(4).   The exemption contains two threshold requirements—the information must be (1) "obtained from a person" and (2) "commercial or financial."   *See Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 266 (D.C. Cir. 1982).   If these threshold requirements are met, then the court must determine if the information is "privileged or confidential."   *Id.*

Here, Plaintiff does not question whether the material withheld pursuant to Exemption 4 was "obtained from a person" or was "commercial or financial."   Rather, it disputes the material's confidential or privileged character.   *See* Pl.'s Opp'n at 6–11.   The court considers those challenges separately, as each relates to a different set of documents.

### 1. *Confidential Business Information*

Defendant first seeks to withhold as confidential two categories of material—(1) "[c]ontract provisions that reveal vendor hourly rates, specific negotiated considerations and/or terms and conditions reflecting agreement between Sandia and its vendors," and (2) "slides, presentations, and other documentary information . . . [that] reveals confidential Sandia business contract strategy."   NNSA's Mot. at 14.   According to Defendant, such proprietary business information qualifies for Exemption 4 protection because its disclosure would cause competitive harm to Sandia and impair the government's ability to collect similar information in the future.   *Id.* at 15–16.   Plaintiff counters that Exemption 4 does not justify withholding such information because the documents relate to unlawful lobbying activities, which no lawfully abiding Sandia competitor would adopt—thus negating any concerns regarding unfair competitive advantage—and which the government readily will be able to acquire in the future through exercise of its police powers.   Pl.'s Opp'n at 8–9.

The Court of Appeals has developed two tests to determine whether information is "confidential" for purposes of Exemption 4.   Which test to apply depends on the manner in which the government agency obtained the information at issue.   When an agency receives the information by way of a *mandatory* disclosure, the information is considered confidential for purposes of FOIA Exemption 4 if disclosure is likely to (1) impair the agency's ability to obtain the information in the future or (2) cause substantial harm to the competitive position of the source of the information.   *Nat'l Parks Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974). The inquiry is an objective one.   *See Wash. Post Co.*, 690 F.2d at 268.

A different test applies, however, when an agency receives information by way of a *voluntary* disclosure.   In that case, the information is confidential for purposes of Exemption 4 if

it is "of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992).  The parties disagree as to whether Sandia voluntarily submitted the business information at issue.

a.     Was the information submitted voluntarily?

Defendant, for its part, asks the court to apply the more relaxed *Critical Mass* test because "the information was turned over to the government, without any legal compulsion on behalf of the OIG."  NNSA Mot. at 12.  Defendant puts forward an affidavit from James Eanes—a Sandia employee responsible for responding to FOIA requests—stating that Sandia would not "typically" make the information at issue available to the public and that Sandia provided the "documents to the OIG without the need of a subpoena, court order, or any warrant."  Eanes Decl. ¶¶ 11, 17. Accordingly, Defendant argues, the redacted information was submitted voluntarily and the *Critical Mass* test governs.  NNSA Mot. at 11.

Plaintiff, on the other hand, asserts that Sandia "did not turn over this material voluntarily, but under duress, after being forced to do so when the government issued a '7-day notice letter,'" Pl.'s Opp'n at 8, in which an NNSA official instructed Sandia's president to "provide two copies of all requested documents . . . [or he would] refer the matter to the Office of the Inspector General."  Pl.'s Opp'n, Ex. C, ECF No. 30-5.  Because the NNSA official threatened to refer Sandia to OIG in the event of non-compliance, Plaintiff argues, the documents were produced as a result of "government compulsion" and therefore the more stringent *National Parks* test applies. Pl.'s Opp'n at 8.

When determining whether information is submitted voluntarily, courts look to the agency's "actual legal authority" to compel the documents or information at issue, rather than the

"parties' beliefs or intentions" about the agency's authority to do so.  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001).  Thus, where an agency requests information from a regulated entity that it would otherwise have the legal authority to compel, the resulting productions are involuntary and the *National Parks* test controls.  For example, in *In Defense of Animals v. United States Department of Health and Human Services*, the district court considered whether a private research facility's responses to a request for information regarding its financial condition, sent by a federal agency providing financial support to that facility, were voluntary.  The court held that such submissions were involuntary, even though the letter merely requested production of information, because the agency had the authority to compel production as a condition for continuing to provide financial support.  No. 99-3024, 2001 WL 34871354, at *9 (D.D.C. Sept. 28, 2001).  Like the letter in *In Defense of Animals*, the so-called seven-day notice letter sent here by NNSA offered Sandia no real choice—Sandia either could produce the documents "voluntarily" or OIG would compel their production.  The very real specter of government compulsion renders Sandia's production here involuntary for purposes of Exemption 4.  Accordingly, the *National Parks* test governs.

b.      Was the information confidential under *National Parks*?

To determine whether information is confidential, the *National Parks* test requires courts to evaluate whether disclosure of the withheld information is likely either to:  (1) impair the government's ability to obtain the necessary information in the future, or (2) cause substantial harm to the competitive position of the person from whom the information was obtained.  498 F.2d at 770.  Here, as explained below, because the court finds that Defendant has sufficiently demonstrated that disclosure likely would cause Sandia substantial competitive harm, it need not

9

determine whether disclosure would impair the government's ability to obtain the necessary information in the future.

In evaluating whether disclosure is likely to result in substantial competitive harm, the court "need not conduct a sophisticated economic analysis of the likely effects of disclosure." *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1291 (D.C. Cir. 1983). While an agency may not rely on conclusory and generalized allegations of harm, it also need not make an affirmative showing of actual competitive harm. *Id.* Rather, "evidence revealing actual competition and the likelihood of substantial competitive injury is sufficient to bring commercial information within the realm of confidentiality." *Id.* (internal quotation marks omitted). Competitive injury, however, "[is] limited to harm flowing from the affirmative use of proprietary information *by competitors* . . . . [and] should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement or from . . . embarrassing publicity." *Id.* at 1291 n.30.

Here, there is no dispute of fact that Sandia "faces actual competition in the bidding process," thus satisfying the actual competition requirement. NNSA Mot. at 15. As to the second element—a likelihood of substantial competitive injury—the Eanes Declaration explains that disclosing the terms of Sandia's vendor contracts would "likely cause Sandia competitive disadvantage with respect to future negotiations with its consultants, and create a likelihood of substantial competitive injury to Sandia's ability to negotiate future similar contracts." Eanes Decl. ¶ 8. Releasing Sandia's vendor contracts, he continues, "would reveal how Sandia priced its hourly rates and structured its terms and conditions during its performance as a government contractor and would give prospective subcontractors who came into possession of such information an unfair and inappropriate contracting advantage relative to negotiations with

Sandia." *Id.* ¶ 9. With respect to the slides, presentations, and other strategy documents—the second group of documents Defendant has withheld—Eanes states that their release "would give any competitor a clear advantage because they would know [Sandia's] strategy and analysis on how they prepare bids or how they evaluate key terms, strategies, or other business related aspects when formulating a contract with the government." *Id.* ¶ 13. More specifically, Eanes asserts that releasing "key aspects of the company's considered approach for managing of its business and its future relationship with the US Government . . . would provide competitors for the [contract] with NNSA a clear advantage because they would know [Sandia's] strategy . . . in anticipation of contract negotiations with the US Government." *Id.* ¶ 11. The court finds that these statements are sufficiently detailed to establish a likelihood of substantial competitive harm caused by disclosure of those materials. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d at 1200.

Plaintiff disputes that releasing Sandia's commercial information would cause competitive harm. It argues that, because Sandia engaged in a "business relationship with the U.S. government [that] was illegal," "one must assume that Sandia's competitors . . . will not adopt these illegal methods in the future." Pl.'s Opp'n at 9. Therefore, Plaintiff maintains that this information, even if commercial in nature, is useless to Sandia's competitors and should not be afforded protection under FOIA. *Id.*

Plaintiff's argument misses the mark. The court agrees that Exemption 4 cannot be used to shield illegal business practices under the guise of confidential business information. But that is not what Defendant seeks to do here. Rather, Defendant invokes Exemption 4 to withhold the details of a business strategy that would have been legal but for Sandia's improper use of government funds to develop and execute that strategy. *See* NNSA Mot. at 14–16; NNSA Mot., Ex. C, ECF No. 27-3; NNSA Mot., Ex. D, ECF No. 27-4. Plaintiff admits as much in its

Opposition.  *See* Pl.'s Opp'n at 2 ("Instead of investing its own money to chase the new contract, however, Sandia Corporation paid for the lobbying effort with funds designated for carrying out its core national security functions.  *It is this action that the OIG declared unlawful*." (emphasis added)).  Thus, the information that Defendant designated as confidential is not itself unlawful or the product of inherently illegal activity.  In other words, the court can separate Sandia's bad acts from the information it seeks to protect.

The court similarly rejects Plaintiff's contention that Exemption 4 "should only be extended to contractors whose practices are within the law, and not held up as a shield to protect lawbreakers from embarrassment."  *Id*. at 9–10.  Plaintiff cites no authority for the proposition that corporate wrongdoing automatically disqualifies an agency from invoking Exemption 4 on behalf of a company.  Again, Defendant has demonstrated that, if the information at issue—as distinct from the misconduct itself—was disclosed, that disclosure would likely harm Sandia's competitive position with respect to future bids for government contracts and negotiations for consultant services.  On that point, Plaintiff has offered no contrary evidence.  Accordingly, the court finds Defendant properly redacted the vendor agreement information and strategy materials pursuant to Exemption 4.

### 2.    *Privilege*

Next, Defendant seeks to withhold a single "email communication between Sandia managers and Sandia legal counsel" as legally privileged under Exemption 4.  NNSA Mot. at 13–14.  Plaintiff retorts that the crime-fraud exception to the privilege applies to the email, and thus strips it of any confidentiality, because "Sandia's general counsel played an active role in every step of the scheme that the inspector general determined to be illegal."  Pl.'s Opp'n at 10.

"The attorney-client privilege applies only if, *inter alia*, 'the communication relates to a fact of which the attorney was informed . . . by his client . . . for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding.'" *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (alterations in original) (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)).   Such communications, however, are not considered privileged if, among other things, they "are made in furtherance of a crime, fraud, or other misconduct," *id*., or if the party asserting the privilege has previously disclosed the communications such that they waive the privilege, *see In re Kellogg Brown & Root, Inc*., 796 F.3d 137, 145 (D.C. Cir. 2015).

Here, Defendant's declarations fall well short of establishing the attorney-client privilege. They are entirely conclusory and lack the factual detail needed to decide whether the privilege is applicable.   *See* Eanes Decl. ¶ 15 ("Sandia identified as both legally privileged and confidential (business proprietary) information that included communications between Sandia managers and Sandia legal counsel.")); NNSA Mot., Ex. 2, ECF No. 26-2 [hereinafter Hamblen Decl.], ¶ 16 ("NNSA also redacted information pursuant to Exemption 4, which exempts from mandatory disclosure of privileged commercial information.").   For instance, the court cannot determine from either declaration whether Sandia's counsel was providing privileged legal services or non-privileged business advice.   Nor can the court say whether the privilege was waived.   After all, Sandia turned over the email in question to OIG.   Further, Plaintiff has raised the crime-fraud exception, but the declarations' lack of factual detail prevents the court from deciding whether the exception applies.   In sum, the court cannot determine at this time whether the email is privileged.

Additionally, unlike the vendor contracts and strategy information discussed above, Defendant has made no effort to show a likelihood of competitive harm or impairment of

government information gathering, as required under *National Parks*, aside from one wholly conclusory statement that "[r]elease of such information would damage . . . legitimate Sandia business interests." NNSA Mot. at 14. This does not suffice.

Accordingly, Defendant has failed to establish that Exemption 4 applies to the withheld email communication. The court, however, will not order Defendant to release the email at this time. Defendant shall be afforded the opportunity to supplement its affidavit to address the deficiencies identified above.

### B.   Exemptions 6 and 7(C)

The court now turns to Defendant's reliance on FOIA Exemptions 6 and 7(C)—which protect various privacy interests—to withhold names and other identifying information appearing in the responsive records. The court begins with the redactions for which Defendant invoked both Exemptions 6 and 7(C), and then addresses the information withheld on the ground of Exemption 6 alone.

#### 1.   *Exemption 7(C)*

Defendant invokes both Exemptions 6 and 7(C) to withhold the names of three categories of individuals: (1) "all individuals employed by Sandia"; (2) "DOE employees who serve at the GS-15 level and below"; and (3) "individuals who were interviewed in the course of the OIG's inquiry." DOE Mot. at 8. Because "'Exemption 7(C) is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material," the court need only consider Defendant's reliance on Exemption 7(C) for these three categories. *See Am. Civil Liberties Union (ACLU) v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quoting *U.S. Dep't of Defense v. FLRA*, 510 U.S. 487, 496 n.6 (1994)).

Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). To determine whether the release of information would constitute an "unwarranted invasion of privacy," the court must balance "the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992); *see also ACLU*, 655 F.3d at 6.

Individuals such as law enforcement personnel, witnesses, informants, and "third parties who may be mentioned in investigatory files" have "an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation." *Nation Magazine, Wash. Bureau v U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995). Such individuals also have a "second, distinct privacy interest in the *contents* of the investigative files." *Citizens for Pub. Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1092 (D.C. Cir. 2014). The public disclosure of law enforcement files has the potential to cause public embarrassment and humiliation, at the very least, and possibly more severe consequences to reputational and pecuniary interests. *Id.*

To protect these substantial privacy interests, the D.C. Circuit has adopted a "categorical rule [under Exemption 7(C)] permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity." *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (internal quotation marks omitted); *see also Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 999 (D.C. Cir. 1998) (describing the public interest in

names listed in law enforcement records as "insubstantial unless the requester puts forward compelling evidence that the agency denying the FOIA request is engaged in illegal activity and shows that the information sought is necessary in order to confirm or refute that evidence" (citation omitted) (internal quotation marks omitted)).   Here, unlike in many cases, Plaintiff satisfies *Schrecker*'s required showing of illegal activity—OIG concluded that Sandia personnel violated federal law by using taxpayer dollars to conduct lobbying activities—so Defendant cannot rely on the categorical rule to withhold the names.   Nor has Defendant attempted to do so.   It did not invoke the categorical rule and instead determined that the balancing of the public and private interests tips in favor of non-disclosure.   *See* DOE Mot. at 10–14.

In conducting the public-private balancing, the court is guided primarily by two cases: *Stern v. Federal Bureau of Intelligence*, 737 F.2d 84 (D.C. Cir. 1984), and *Beck v. United States Department of Justice*, 997 F.2d 1489 (D.C. Cir. 1993).   *Stern* was an appeal of a district court order requiring the FBI to disclose the names of both "lower-level employee[s]" and a Special Agent who were implicated in a highly publicized scandal involving illegal surveillance of political activists and its subsequent cover-up.   *Stern*, 737 F.2d at 92–93.   Although the Court of Appeals observed that the implicated federal employees' privacy interest was "diminishe[d] . . . because of the corresponding public interest in knowing how public employees are performing their jobs," it also stated that the extent of the public's interest turned on "the level of responsibility held by a federal employee, as well as the activity for which such an employee has been censured."   *Id.* at 92.   The court reversed the district court's disclosure order as to the lower-level employees, but not the Special Agent.   Describing it as a "close case," the Court of Appeals found that the public interest in the names of the lower-level employees was diminished because (1) they had only engaged in negligent, as opposed to intentional, misconduct, and (2) the disclosure of their names

risked associating them with "serious criminal wrongdoing when, in fact, they were totally cleared of any such acts." *Id*. at 93.  It reached the opposite conclusion as to the Special Agent, however, because "[h]e was a higher-level official than the other two employees, and he participated *knowingly* in the cover-up." *Id.*  "The public has a great interest," the Court held, "in being enlightened about that type of malfeasance by this senior FBI official . . . an interest that is not outweighed by his own interest in personal privacy." *Id.* at 94.

Nine years later, in *Beck*, the Court of Appeals narrowed the scope of *Stern*.  At issue in *Beck* was a district court decision permitting an agency to withhold records of complaints against two Drug Enforcement Agency agents, the existence of which the agency refused to confirm or deny.  997 F.2d at 1491.  In affirming the district court's decision, the Court observed that the "identity of one or two individual relatively low-level government wrongdoers, released in isolation, does not provide information about the agency's own conduct." *Id.*  at 1493.  The court also distinguished *Stern*, stating that "[i]t suffices to note that the public interest identified in *Stern* was based on the widespread knowledge that certain FBI employees had been censured for their participation in a notorious criminal investigation.  Here, by contrast, there is no evidence, let alone any public knowledge, that wrongdoing occurred." *Id.* at 1494.  *See also Jefferson v. Dep't of Justice, Office of Professional Responsibility*, 284 F.3d 172, 180 (D.C. Cir. 2002) (stating that *Beck* "indicated the limits of *Stern*").

This court distills two key lessons from *Stern* and *Beck*.  First, the public interest varies depending on the individual government employee involved in the wrongdoing and therefore the agency must make an individualized assessment of the public interest as to each employee.  Second, that individualized assessment is fact-bound.  The factors that courts must consider in weighing the public interest include:  (1) the seniority of the employee; (2) the employee's relative

degree of culpability; (3) the seriousness of the misconduct; and (4) the level of public awareness of the employee's identity and her actions.

Defendant relies on the declaration of Adrienne Martin—an information specialist with OIG—to support its invocation of Exemption 7(C).  *See* DOE Mot., Ex. 1, ECF No. 22-1 [hereinafter Martin Decl.].  The court has evaluated the Martin Declaration in light of *Stern* and *Beck* and concludes that it does not reflect the individualized, fact-bound assessment of the public interest demanded by those cases.  The Martin Declaration concedes that there is a legitimate public interest in learning about Sandia's unlawful lobbying activities.  *See* Martin Decl. ¶ 21 (acknowledging that "the public has a legitimate interest in knowing that a corporate entity has taken a certain action").[3]  Although it makes that concession, the declaration does not then weigh the public interest in light of the facts pertinent to the individual employees who engaged in the illegal lobbying efforts.  *See id.* (making the blanket assertion that the public has "a much lower interest in knowing the identities of those corporate employees who took those actions").  Instead, it simply groups the employees into three broad categories that tell the court little about the conduct of the individual employees.  Such an approach is improper.  *See Stern*, 737 F.2d at 91 ("Because the myriad of considerations involved in the Exemption 7(C) balance defy rigid compartmentalization, per se rules of nondisclosure based upon the type of document requested, the type of individual involved, or the type of activity inquired into, are generally disfavored.").

The first category in the Martin Declaration—"all individuals employed by Sandia"— illustrates the problem with Defendant's approach.  Within that broad grouping, the court cannot discern an individual employee's position within Sandia's corporate structure or her relative role or culpability in the lobbying activities.  As defined, the category likely includes the architects of

---

[3] Notably, Defendant does not argue that there is no public interest or the public interest is diminished because Sandia is a government *contractor* operating a government-owned facility, as opposed to a government *agency*.

the lobbying scheme, as well as lower-level administrative assistants who scheduled meetings or forwarded emails, but did not knowingly participate in any wrongdoing.  No meaningful weighing of the public interest is possible from such an indistinct grouping of employees.

The same is true of the third category—"those who were interviewed during the course of [OIG's] inquiry."  Martin Decl. ¶ 18.  It is apparent from the OIG Report that OIG interviewed Sandia officials directly involved in devising and implementing the lobbying plan.  *See, e.g.,* Martin Decl., Ex. 2, ECF No. 22-2, at 17–20, 23.  Lumping such officials together, possibly with lower-level, less culpable individuals, makes an individualized determination of the public interest impossible.  Moreover, the Martin Declaration makes no effort to explain why the names of high-level Sandia officials were withheld, yet the names of the three consultants Sandia hired were disclosed.  *See id.* at 17–19; Pl.'s Opp'n, Ex. A, ECF No. 30-3, at 8.  One would think that the public interest in the release of the names of Sandia officials involved in wrongdoing would be at least as significant as the names of the consultants that they hired, especially because those consultants may not have known that taxpayer dollars were used to pay them.  The Martin Declaration does not resolve that tension.

The justification for withholding names falling within Defendant's second category— "DOE employees who serve at the GS-15 level and below"—presents a closer call.  The public interest in the identity of those employees is diminished because of their lower rank in the government hierarchy.  *See Beck*, 997 F.2d at 1493.  Yet, the Martin Declaration ultimately falls short in showing that those employees' privacy interest outweighs the public interest, too, because it does not affirmatively state that no GS-15 level or below employee participated in the unlawful activities or, to the extent any one of them did, what role that person played or her degree of culpability.  The declaration does state that this group of employees engaged in "purely ministerial

actions," Martin Decl. ¶ 17, but without some representation that the agency has conducted an individualized assessment of each employee's conduct, the court cannot be confident that Exemption 7(C) applies to all employees in this category. The court can envision a scenario in which the privacy interest of a lower-level employee who engages in intentional criminal acts is outweighed by the strong public interest in knowing such employee's identity. That may not be this case. But, as discussed, Defendant has not provided enough evidence for the court to make such a determination at this time.[4]

Accordingly, the court finds that the Martin Declaration, in its current form, does not sufficiently support the withholding of employees' names under Exemption 7(C). The court will not, however, order their disclosure at this time. Instead, Defendant will be given an opportunity to supplement its declaration to show, through an individualized assessment of each employee, the private interest in non-disclosure outweighs the public interest in disclosure. In doing so, Defendant shall take into account the factors discussed above. This is not to say that Defendant may not group employees together when appropriate. Such a grouping, however, must be accompanied by an attestation that the declarant has considered the individual characteristics of each employee within the group and that the facts common to those employees, such as their level of employment and relative roles in Sandia's illegal lobbying activities, tilt the balancing in favor of non-disclosure.

2.     *Exemption 6 Redactions*

Turning to Exemption 6, Defendant grouped those persons into two categories: (1) "low-level contractor employees who were not directly involved in the underlying facts and issues that

---

[4] The court's ruling does not extend to the OIG employees who, as the Martin Declaration describes, "were performing investigative activities." *See* Martin Decl. ¶ 17. The court agrees with Defendant that there is no relevant public interest in the identities of OIG investigators, and therefore concludes that Defendant's withholding of those names is appropriate.

were the subject of the investigation"; and (2) "individuals who were identified as part of Sandia's strategy to extend their government contract" but for whom there is "no indication that any of them were willing participants" in Sandia's lobbying efforts.  NNSA Mot. at 20–21.

Under Exemption 6, agencies may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  To determine whether a disclosure would constitute a "clearly unwarranted invasion of personal privacy," courts must conduct the private-public balancing of interests that applies under Exemption 7(C).  *See Beck*, 997 F.2d at 1491 (stating that the "same standard" is applicable to both Exemption 6 and 7(C)).  The public interest in disclosure, as in the 7(C) context, is "the citizens' right to be informed about 'what their government is up to.'"  *Id.*

First, there is little or no public interest in disclosing the names of government officials that Sandia had targeted for lobbying—making their names public would not inform citizens what their government is up to.  After all, the subject of the OIG investigation was the conduct of Sandia personnel, not those that they targeted.  Nor is there any suggestion that the targets engaged in any wrongdoing.  Plaintiff maintains that disclosing the identities of the lobbying targets would aid the public's understanding of "Sandia's effort."  *See* Pl.'s Opp'n at 15.  But even if that were so, such an interest is, at best, extremely narrow and, when balanced against the serious privacy concern faced by a government official unwittingly associated with unlawful lobbying, it simply does not justify disclosure.  *See Stern*, 737 F.2d at 93.

For the same reason, the court also finds that Defendant has sufficiently justified invoking Exemption 6 to withhold the names of "low-level contractor employees who were not directly involved in the underlying facts and issues that were the subject of the investigation."  NNSA Mot. at 20.  Plaintiff maintains that Defendant has not provided sufficient evidence demonstrating that

these low-level employees did not participate in the lobbying scheme, regardless of their relative seniority, and that there is a strong public interest in disclosure because those individuals were "involved in the email chain [that] was privy" to the Sandia lobbying scheme.  Pl.'s Opp'n at 13–14.  The court disagrees.  Defendant here relies on the declaration of Christina Hamblen—an information specialist working at NNSA—which states that "low-level contractor employees" did not engage in any wrongdoing—they simply "forward[ed] emails, coordinat[ed] meetings, [were] copied on emails, or [] were third party contractors who had consulting contracts with Sandia." Hamblen Decl. ¶ 18.  In that respect, the Hamblen Declaration contains a level of detail about lower-level employee conduct that is lacking in the Martin Declaration.  As a result, the Hamblen Declaration satisfies the requirements of *Stern* and *Beck*, whereas the Martin Declaration does not. *Compare id.*, *with* Martin Decl. ¶ 17.  In short, Defendant has justified its assertion of Exemption 6 to the court's satisfaction.

### C.     Exemptions 3, 7(E), and 7(F)

Last, Defendant relies on Exemptions 3, 7(E), and 7(F) to withhold information implicating national security concerns.  *See* NNSA Mot. at 8, 22–24.  Plaintiff, for its part, attacks these justifications as "vague, hypothetical, and conclusory."  Pl.'s Opp'n at 16.

Exemption 3 allows for non-disclosure of records that are "specifically exempted from disclosure by statute" provided that such statute either "(A) [requires withholding] in such a manner as to leave no discretion on the issue," or "(B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3); *see also Senate of the Commonwealth of Puerto Rico v. United States U.S. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987).  Exemption 7(E) allows an agency to withhold information compiled for law enforcement purposes if its release "would disclose techniques and procedures for law

enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Exemption 7(F) protects law enforcement information that "could reasonably be expected to endanger the life or physical safety of any individual." *Id*. § 552(b)(7)(F).

The Hamblen Declaration explains Defendant's rationale for invoking these exemptions. *See* Hamblen Decl. ¶¶ 9–10 ("The portions of [the documents] withheld pursuant to Exemption 3" may not be disclosed under 42 U.S.C. § 2168(a)(1)(B)(C) because they "pertain to security measures for the physical protection of . . . Sandia National Laboratory."); *id*. at ¶ 22 ("The information withheld pursuant to Exemption 7(E) relates to techniques about detecting missile attacks . . . [and] also pertains to matters of national security that would give potential for harm to the nation by terrorists."); *id*. at ¶ 23 ("The information withheld pursuant to 7(F) is related to vulnerabilities and areas that need improvement regarding certain sensitive governmental programs that relate to protection of nuclear materials, detection and sensing foreign nuclear weapon proliferation and nuclear defense risks.").

The court finds that the Hamblen Declaration provides a logical and plausible basis for Defendant to withhold sensitive national security information pursuant to Exemptions 3, 7(E), and 7(F). *Judicial Watch, Inc.*, 715 F.3d at 941. As the Court of Appeals has made clear, the judiciary generally defers to executive branch decisions to withhold information on national security grounds. *See Center for Nat. Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003). Plaintiff has given the court no reason to deviate from that practice here. Accordingly, the court will grant judgment in favor of Defendant regarding the information it withheld pursuant to Exemptions 3, 7(E), and 7(F).

### D.        Segregability

Finally, the court addresses Defendant's segregability determination.  A district court must evaluate segregability even where, as here, the requester has not challenged it.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d1106, 1116 (D.C. Cir. 2007) ("If the district court approves [a] withholding without . . . a finding [as to segregability], remand is required even if the requester did not raise the issue of segregability before the court.").[5]

Because "the focus of FOIA is information, not documents . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  FOIA therefore requires that "[a]ny reasonably segregable portion of [the] record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  An agency must provide a "detailed justification" and not just make "conclusory statements" to support its segregability determination.  *Mead Data Cent.*, 566 F.2d at 261.  Agencies, however, "are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which can be overcome by contrary evidence produced by the requester. *Sussman*, 494 F.3d at 1117.

Here, the Hamblen Declaration merely states that "[a]fter extensive review of the documents at issue . . . there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information."  Hamblen Decl. ¶ 24. Notwithstanding the deference owed to an agency's determination of segregability, the court finds the Hamblen Declaration inadequate.  It merely states, without "detailed justification" and in

---

[5] The court here only addresses Defendant's segregability determination concerning the documents that were properly withheld pursuant to Exemptions 3, 4, 6, 7(E), and 7(F), as described in the Hamblen Declaration.  The court will address Defendant's segregability determination with respect to the remaining documents, as necessary, after Defendant is given an opportunity to supplement its declarations.

"conclusory" fashion, that no responsive documents are segregable.  That may be so, but the court needs more information before it is satisfied that the agency has carried out its duty to disclose the reasonably segregable portion of the responsive documents.  Thus, Defendant is directed to consider the segregability of those documents and provide a sufficiently "detailed justification" regarding its ultimate segregability determination.  *Mead Data Cent.*, 566 F.2d at 261.

## V.      CONCLUSION AND ORDER

For the reasons set forth above, Defendant's Motions for Summary Judgment are granted in part and denied in part and Plaintiff's Motion for Summary Judgment is denied in part.

If Defendant wishes to supplement its declarations to address the deficiencies identified in this Memorandum Opinion, then it shall do so no later than 30 days from this date.  Within seven days thereafter, the parties shall file a Joint Status Report indicating whether another round of summary judgment briefing will be required in light of the supplemental evidence and, if so, proposing a schedule.

Dated:  January 17, 2017

_____
Amit P. Mehta
United States District Judge