## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**CENTER FOR PUBLIC INTEGRITY,**                )
)
    **Plaintiff,**                                                )
)
        **v.**                                            )    **Civil No. 1:15-cv-01314 (APM)**
)
**U.S. DEPARTMENT OF ENERGY,**                  )
)
    **Defendant.**                                            )
_____ )

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case concerns a Freedom of Information Act ("FOIA") request for records relating to a Defendant Department of Energy ("DOE") investigation into lobbying activities of Sandia Corporation ("Sandia"), a contractor hired by DOE to operate Sandia National Laboratory, a government-owned nuclear facility. In 2009, certain officials of Sandia and its parent company, Lockheed Martin Corporation, devised a plan to lobby Congress and other federal officials to renew Sandia's contract with DOE without competitive bidding. An investigation by DOE's Office of Inspector General later revealed that the plan was developed and carried out with taxpayer funds, in violation of federal law. Sandia eventually reached a civil settlement with the U.S. Department of Justice.

Plaintiff Center for Public Integrity brought this FOIA action against DOE, seeking to compel the disclosure of records concerning the agency's investigation of Sandia. In response to Plaintiff's FOIA request, DOE produced some records in full, some in part, and withheld others in their entirety under certain statutory exemptions. Plaintiff challenges Defendant's reliance on

these exemptions. This court resolved some of Plaintiff's challenges when it ruled upon the parties' initial cross-motions for summary judgment. *See Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 234 F. Supp. 3d 65 (D.D.C. 2017). In its previous Opinion, the court held that Defendant properly withheld information under FOIA Exemptions 3, 7(E), and 7(F), as well as certain information under Exemptions 4, 6, and 7(C). *Id.* at 71. The court also found, however, that Defendant did not provide sufficient justification with respect to certain other information withheld under FOIA Exemptions 4, 6, and 7(C). *See id.* Similarly, the court held that Defendant did not adequately justify its efforts to segregate and release all non-exempt records. *Id.* at 84. The court gave the agency an opportunity to supplement its declarations to address these deficiencies. *Id.* at 71, 84.

Now before the court are the parties' renewed cross-motions for summary judgment. Upon consideration of the parties' submissions and the present record, the court finds Defendant may rely on Exemption 4 to withhold the e-mail communications between Sandia and its legal counsel, except those portions that the agency has officially disclosed through public releases. The court also concludes that Defendant has now provided sufficient justification for its redaction of names and other identifying information pursuant to Exemption 7(C), except as to those names that the agency has officially acknowledged through FOIA disclosures. The court therefore grants the parties' motions in part and denies them in part.

## II.    BACKGROUND

### A.    Factual Background

Sandia National Laboratory ("SNL") is one of three nuclear laboratories falling under the auspices of Defendant Department of Energy ("DOE") and its sub-component, the National Nuclear Security Administration ("NNSA"). *See* NNSA's Mot. for Partial Summ. J., ECF No. 26

[hereinafter Def.'s Second Mot. for Partial Summ. J.], at 7;[1] Def.'s Second Mot. for Partial Summ. J., Decl. of James Eanes, ECF No. 26-1 [hereinafter Initial Eanes Decl.], ¶ 2; Def.'s Mot. for Extension of Time to File NNSA's Mot. for Partial Summ. J., ECF No. 23 [hereinafter Def.'s Mot. for Ext. of Time], at 1; Compl., ECF No. 1, ¶ 5; Answer, ECF No. 8, ¶ 5. SNL is owned by the federal government and forms a part of NNSA's nuclear weapons complex. DOE's Mot. for Partial Summ. J., ECF No. 22 [hereinafter Def.'s First Mot. for Partial Summ. J.], Exs. to Decl. of Adrienne Martin, ECF No. 22-2 [hereinafter OIG Report[2]], at 8. SNL is not run, however, by federal employees; rather, its operations are outsourced to a government contractor. In 1993, following a competitive bidding process, DOE awarded the contract to operate SNL to Sandia Corporation ("Sandia"), a wholly owned subsidiary of Lockheed Martin Corporation ("Lockheed Martin"). *Id.*

Beginning in 2009, Lockheed Martin and Sandia officials grew concerned about renewing the contract to operate SNL, which was set to expire in 2012. Pl.'s Renewed Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J., ECF No. 42 [hereinafter Pl.'s Cross-Mot. & Opp'n], at 2. Under the contract, DOE paid Sandia approximately $2 billion annually to run the nuclear lab. *Id.*; *cf.* OIG Report at 8. Lockheed Martin and Sandia officials hoped to renew the contract without competitive bidding, so they devised a lobbying strategy to secure a contract renewal on a no-bid basis, which included hiring outside consultants. Pl.'s Cross-Mot. & Opp'n at 2; *cf.* OIG Report at 9–11.

---

[1] Citations to the parties' pleadings are to the page numbers electronically generated by CM/ECF.

[2] The "Special Inquiry" report authored by DOE's Office of Inspector General ("OIG") is labeled "Exhibit 2" within ECF No. 22-2. While this document includes both a publicly available memorandum summarizing OIG's findings, *id.* at 7–13, and an official report that contains some of the redactions at issue in this case, *id.* at 14–35, the court will refer to the document collectively as the "OIG Report" unless otherwise noted. Accordingly, the citations herein refer to the page numbers electronically generated by CM/ECF.

In 2013, NNSA conducted a preliminary review of documentation regarding consultant activities between SNL and Heather Wilson, LLC. OIG Report at 8. Based on that review, NNSA alleged that "SNL impermissibly attempted to influence an extension to the Sandia Corporation contract and engaged Ms. Wilson," a former member of the U.S. House of Representatives, "in these activities." *Id.* This allegation, in turn, launched a special inquiry by DOE's Office of Inspector General ("OIG"). *Id.* During the OIG inquiry, Sandia took the position that its activities did not violate federal law. *See id.* at 12.

OIG published the results of its investigation in November 2014. In its Report, OIG concluded that "SNL used Federal contract funds to engage in activities that were intended to influence the extension of Sandia Corporation's contract with [DOE]," in violation of federal law. *Id.* at 8–9; *see also id.* at 9 (citing 31 U.S.C. § 1352(a)(1), and 48 C.F.R. § 31.205–22(6)). Specifically, OIG found that (1) "SNL formed an in-house Contract Strategy Team and utilized consultants" to develop "a plan to secure a non-competitive bid extension" of Sandia's contract with DOE, "an essential element of [which] was to influence members of Congress and Federal officials"; (2) "SNL employees, funded directly or indirectly with Federal resources, were actively engaged in implementing the plan of the Contract Strategy Team and closely coordinated with [Lockheed Martin] officials during this effort"; and (3) in addition to its contract extension efforts, SNL disregarded concerns that its provision of certain information to the New Mexico Congressional Delegation could be construed as lobbying, and continued to make suggestions to Congress. *See id.* at 9–12. OIG offered a series of recommendations in its Report, including that DOE management take steps to ensure SNL contractors would not interface with government customers or legislators in order to obtain Sandia business and to recover any costs determined to

be unallowable.  *Id.* at 13.  DOE management concurred with the Report's findings and identified actions to address OIG's recommendations.  *See generally id.*[3]

Sandia's lobbying activities also drew the attention of the U.S. Department of Justice ("DOJ").  Following an investigation, DOJ announced in August 2015 that Sandia had agreed to pay $4,790,042 to settle alleged violations of the Byrd Amendment and False Claims Act for its use of federal funds to lobby Congress and federal agencies.  Pl.'s Cross-Mot. & Opp'n at 6; *Sandia Corporation Agrees to Pay $4.7 Million to Resolve Allegations Related to Lobbying Activities*, U.S. Dep't of Justice (Aug. 21, 2015), https://www.justice.gov/opa/pr/sandia-corporation-agrees-pay-47-million-resolve-allegations-related-lobbying-activities.    Sandia did not make any admission of liability as part of the settlement.  *Id.*

## B.      Procedural History

In November 2014, Plaintiff Center for Public Integrity submitted a FOIA request to DOE to produce, in sum and substance, all records relating to OIG's investigation of Sandia.  The history of Plaintiff's FOIA request is fully set forth in the court's earlier Opinion, so the court does not repeat it here.  *See generally Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 72.  For present purposes, it suffices to say that DOE withheld certain material, described in greater detail below, on the basis of FOIA Exemptions 4 and 7(C).  Those withholdings are the subject of the parties' renewed cross-motions for summary judgment.

---

[3] As stated above, *supra* note 2, OIG made the memorandum accompanying the official Report publicly available. *Compare* OIG Report at 7–13, *with Special Inquiry: Alleged Attempts by Sandia National Laboratories to Influence Congress and Federal Officials on a Contract Extension*, U.S. Dep't of Energy, Office of Inspector General (Nov. 2014), https://energy.gov/sites/prod/files/2014/11/f19/IG-0927.pdf.   The Report itself, however, was only recently produced with redactions as a result of Plaintiff's FOIA request.  *See* OIG Report at 14–35; *cf.* Hr'g Tr. (draft), Dec. 15, 2017, at 68–69.  The foregoing summary is based upon the memorandum, which is publicly available.

### III. STANDARD OF REVIEW

Most FOIA cases are appropriately resolved on motions for summary judgment. *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

The agency bears the burden of proving that it withheld certain materials responsive to a plaintiff's FOIA request pursuant to a statutory exemption. *Citizens for Pub. Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) [hereinafter *CREW I*]. "The agency may carry that burden by submitting affidavits that 'describe the justification for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). "To successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with specific facts demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (internal quotation marks omitted).

## IV.    DISCUSSION

The parties' renewed cross-motions for summary judgment present three issues for resolution: (1) whether Defendant properly withheld e-mails between Sandia officials and the company's legal counsel pursuant to Exemption 4; (2) whether Defendant properly redacted the names and other identifying information of certain individuals pursuant to Exemption 7(C); and (3) whether Defendant satisfied its obligation to produce all reasonably segregable material.  The court will address each of these issues in turn, starting with the parties' dispute over the applicability of Exemption 4.

### A.    Exemption 4

In this case, large portions of two e-mail strings between Sandia managers and Sandia legal counsel remain at issue under Exemption 4.  Def.'s Renewed Mot. for Summ. J., ECF No. 41 [hereinafter Def.'s Mot.], at 6–7; Def.'s Mot., Def.'s Statement of Material Facts Not in Dispute, ECF No. 41-4 [hereinafter Def.'s Stmt. of Facts], ¶ 8.  *See generally* Notice of Filing of Exs. in Supp. of Def.'s Mot. for Partial Summ. J., ECF No. 27, Ex. H, ECF No. 27-7.  Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information [that is] obtained from a person and [is] privileged or confidential."  5 U.S.C. § 552(b)(4).  As written, the exemption contains two threshold requirements—"the information must be (1) 'obtained from a person' and (2) 'commercial or financial.'"  *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 266 (D.C. Cir. 1982) [hereinafter *Wash. Post I*].  If these threshold requirements are met, then the court must determine if the information is "privileged or confidential."  *Id.*

Exemption 4's threshold elements are not at issue.  Plaintiff does not question whether the material withheld pursuant to Exemption 4 was "obtained from a person."  *See* Pl.'s Cross-Mot. for Summ. J. & Opp'n to Def.'s Mots. for Summ. J., ECF No. 30 [hereinafter Pl.'s Initial Cross-

Mot.], at 8; *see also* 5 U.S.C. § 551(2) (defining "person" to include a "corporation"). Similarly, Plaintiff agrees with Defendant that the e-mails withheld contain "commercial" information. *See* Pl.'s Initial Cross-Mot. at 8; *see also* Def.'s Second Mot. for Partial Summ. J. at 17 ("The documents include . . . emails regarding commercial information."); *cf.* Pl.'s Cross-Mot & Opp'n at 4–5 (solely addressing privilege); Pl.'s Reply to Def.'s Opp'n to Pl.'s Renewed Cross-Mot. for Summ. J., ECF No. 46 [hereinafter Pl.'s Reply], at 1–3 (same). Thus, the sole dispute pertains to the redacted material's privileged or confidential character. As to the former ground, Defendant specifically claims that the redactions to the e-mails are protected from disclosure by the attorney-client privilege. Def.'s Mot. at 6–8.

    1.  *Privilege*

    The court previously held that Defendant's declarations fell "well short of establishing attorney-client privilege" because they lacked the necessary factual detail to decide certain key issues, including (1) whether Sandia's counsel was providing legal, as opposed to business, advice to Sandia managers, and (2) whether Sandia waived the privilege through third-party disclosure. *Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 77. Defendant's supplemental declaration responds to these shortcomings. First, Defendant's declarant, James Eanes, a Sandia employee responsible for managing Sandia's interactions with NNSA, *see* Initial Eanes Decl. ¶¶ 1, 3, explains that the purpose of the e-mails was to secure legal advice of Sandia's counsel regarding the interpretation of applicable law and contractual requirements. *See* Def.'s Mot. at 7; Def.'s Mot., Decl. of James Eanes in Supp. of Def.'s Mot. for Summ. J., ECF No. 41-2 [hereinafter Suppl. Eanes Decl.], ¶ 3. Specifically, he states that "[t]he email thread relates to Sandia management's request for legal advice regarding the permissible extent to which it could undertake certain contract completion strategies, to include funds available for those strategies." Suppl. Eanes Decl. ¶ 5. Additionally,

Eanes notes that the e-mail threads contain "two privilege notifications consistent with the assertion of the Attorney-Client Privilege and/or Attorney Work Product Immunity." *Id.* ¶ 4.

For its part, Plaintiff does not challenge the applicability of the attorney-client privilege in the Exemption 4 context or the agency's insistence that the e-mails qualify as attorney-client communications. *See* Pl.'s Cross-Mot. & Opp'n at 4–5. Instead, Plaintiff focuses solely on the issue of waiver.[4] It argues that Sandia waived the attorney-client privilege by voluntarily producing the e-mails in full to OIG. *Cf. id.* at 5. Thus, according to Plaintiff, Exemption 4 cannot shield e-mails that lost their privileged character years ago. The court agrees.

The D.C. Circuit adheres to a "strict rule on waiver" of the attorney-client privilege. *SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997). That rule requires the holder of the privilege to "zealously protect the privileged materials, taking all reasonable steps to prevent their disclosure." *Id.* "[A]ny voluntary disclosure by the holder of such a privilege is inconsistent with the confidential relationship and thus waives the privilege." *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir. 1984) (quoting *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. Cir. 1981)). "Voluntary disclosure," in turn, "means the documents were not judicially compelled." *Jordan v. U.S. Dep't of Labor*, No. 16-1868, 2017 WL 3382057, at *11 (D.D.C. Aug. 4, 2017) (quoting *Chubb Integrated Sys. v. Nat'l Bank of Wash.*, 103 F.R.D. 52, 63 n.2 (D.D.C. 1984)).

The strict rule on waiver applies with equal force when the voluntary disclosure is made to a federal agency. In *Permian*, the D.C. Circuit held that the subject of a Securities and Exchange

---

[4] Defendant does not dispute that waiver of the attorney-client privilege applies in the context of Exemption 4. *See* Pl.'s Cross-Mot. & Opp'n at 4–5; *see also Zander v. U.S. Dep't of Justice*, 885 F. Supp. 2d 1, 15 (D.D.C. 2012) (stating that the attorney-client privilege is given the "same meaning" in "both the discovery and FOIA contexts"); *see also Wash. Post I*, 690 F.2d at 267 n.50 (noting that the attorney-client privilege "is explicitly mentioned in the legislative history of Exemption 4").

Commission ("SEC") investigation had "destroyed the confidential status" of privileged communications by voluntarily disclosing them to the SEC. 665 F.2d at 1219. The subject of the investigation tried to block the SEC from sharing the communications with another agency, asserting that it had disclosed the privileged records to the SEC for a limited purpose, but the Circuit rejected that argument. *See id.* at 1220–21. The court explained:

> The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit. . . . The attorney-client privilege is not designed for such tactical employment.

*Id.* at 1221. Since *Permian*, the Circuit has consistently held parties to have waived privileged communications that are voluntarily disclosed to government agencies. *See United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) ("Under the law of this circuit, a defendant can waive his attorney-client privilege by releasing documents to . . . an investigative body at the pretrial stage."); *In re Subpoenas Duces Tecum*, 738 F.2d at 1370 (holding that party had "willingly sacrificed its attorney-client confidentiality by voluntarily disclosing" privileged material to the SEC); *see also In re Grand Jury Investigation*, Misc. Action No. 17-2336 (BAH), 2017 WL 4898143, at *11 (D.D.C. Oct. 2, 2017) (citing cases).

Here, Defendant admits that Sandia produced the e-mails to OIG "without any legal compulsion on behalf of the OIG." Def.'s Second Mot. for Partial Summ. J. at 17–18. At oral argument, Defendant further admitted that, at the time Sandia disclosed the e-mails to OIG, it did so without redacting any communication deemed confidential, and that Sandia did not attempt to claw back the e-mails at the time of disclosure or upon the completion of the OIG's investigation. *See* Hr'g Tr. (draft), Dec. 15, 2017 [hereinafter Tr.], at 8–11. To compound matters, OIG directly quoted from portions of both e-mails in the publicly disclosed "Memorandum for the Secretary,"

*see* OIG Report at 12; *supra* note 3, but Sandia never objected to OIG's public release of its attorney-client communications, *cf.* Tr. at 67. And there is more. In its official Report, OIG described and quoted from the e-mails to an even greater extent than done in the Memorandum for the Secretary. OIG Report at 27. Although not publicly disclosed at first, *see* Tr. at 68–69, Defendant produced the OIG Report to Plaintiff *without redacting* references to the e-mail communications, yet Sandia did not complain to Defendant about the release. Sandia's silence in the face of public revelation of its privileged communications is fatal to Defendant's invocation of Exemption 4.

Defendant's arguments to the contrary are all unconvincing. First, Defendant argues that Sandia's disclosure of the e-mails was in fact *involuntary*, rendering the D.C. Circuit's decision in *Permian* inapplicable. Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. & Reply to Pl.'s Opp'n to Def.'s Renewed Mot. for Summ. J., ECF No. 44 [hereinafter Def.'s Opp'n & Reply], at 6–7. That position, however, flies in the face of Defendant's admission that "Sandia provided the[] documents to the OIG without the need of a subpoena, court order, or any warrant." Def.'s Second Mot. for Partial Summ. J. at 17.[5] Nor can Defendant rely on this court's earlier Opinion, which "held that Sandia's production to DOE . . . includ[ing] the email communication at issue[] was involuntary." Def.'s Opp'n & Reply at 6 (citing *Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 75). The court so held in the context of deciding which test to apply to determine whether the information at issue was "confidential" under Exemption 4, as opposed to privileged. *See Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 74–77. An involuntary disclosure in the context of the attorney-client privilege is a different animal. *Cf. Jordan*, 2017 WL 3382057, at *11. And, importantly,

---

[5] Sandia's voluntary disclosure to OIG also renders inapposite Defendant's reliance on *Lavin*, for that case concerned the standard for waiver "with regard to involuntary disclosures." 111 F.3d at 930.

Defendant offers no reason why Sandia could not have withheld from OIG the attorney-client communications it now claims are privileged.

Second, Defendant maintains that Sandia "made an effort to reasonably protect and preserve the email communication as privileged by labeling the email with an 'Attorney-Client Privilege and/or Attorney Work Product Immunity' notification." Def.'s Opp'n & Reply at 7. But Sandia's mere act of placing a confidentiality designation on a document cannot possibly inoculate it from waiver. *Cf. Artesian Indus., Inc. v. Dep't of Health & Human Servs.*, 646 F. Supp. 1004, 1008 (D.D.C. 1986) (holding inadvertent disclosure of inter-office memorandum marked "confidential" to government agency constituted waiver of attorney-client privilege). If a label were all it took to zealously guard the privilege, then the strict rule on waiver would cease to have meaning.

Finally, Defendant asserts a public policy exception to the waiver rule "when the third party to whom disclosure is made is a co-litigant with substantially identical interests." Def.'s Opp'n & Reply at 5 (quoting *Miller, Anderson, Nash, Yerke & Wiener v. U.S. Dep't of Energy*, 499 F. Supp. 767 (D. Or. 1980)). In *Miller*, the district court applied this exception to the disclosure of an internal legal memorandum written by the plaintiff's attorney to a third-party agency, which was deciding whether to intervene in the case. *See* 499 F. Supp. at 771. Here, by contrast, Sandia and OIG did not have "substantially identical" interests at the time Sandia disclosed the e-mails. In fact, they had diametrically opposed interests: OIG was investigating the illegal expenditure of taxpayer funds by Sandia, and Sandia denied any wrongdoing. The fact that Sandia and Defendant now claim to have "substantially identical interests" in this litigation cannot resurrect a privilege that Sandia waived long ago.

In short, applying the strict rule on waiver here, Defendant cannot rely on the attorney-client privilege to withhold the e-mails under Exemption 4.

2.  *Confidential Business Information*

Having found the e-mails are not privileged, the court must address Defendant's alternative argument that the e-mails contain "confidential" information and thus still fall within the ambit of Exemption 4. *See* Def.'s Opp'n & Reply at 7–8; Def.'s Second Mot. for Partial Summ. J. at 16–20; Tr. at 62; *see also Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 78.

The D.C. Circuit has developed two tests to determine whether information is "confidential" for purposes of Exemption 4. If the agency receives the information by way of mandatory disclosure, the court will apply the test set out in *National Parks Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974). If disclosure to the agency is voluntary, the court applies a different test. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878–80 (D.C. Cir. 1992). To determine whether disclosure is "voluntary" and thus which test to apply, courts look to the agency's "actual legal authority" to compel the documents or information at issue. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001).

In its previous Opinion, this court found that the disclosures made by Sandia to Defendant were involuntary and therefore applied *National Parks*. *Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 75. In particular, the court reasoned that Sandia's production of vendor contracts and slides, presentations, and other documentary information relating to its strategy was involuntary because "the so-called seven-day notice letter sent here by NNSA offered Sandia no real choice—Sandia either could produce the documents 'voluntarily' or OIG would compel their production." *Id.* Importantly, however, when the court wrote those words it did not have in mind presumptively

privileged attorney-client communications. There is no dispute that OIG could have compelled Sandia to produce documents such as vendor contracts and slides, presentations, and other documentary information relating to Sandia's strategy. The same cannot be said of Sandia's privileged attorney-client communications. OIG could not have compelled Sandia to produce those e-mail chains; that Sandia did so was a voluntary act. Thus, the court will apply the test set out in *Critical Mass* to the redacted e-mails.

Under *Critical Mass*, voluntarily submitted information need only be "of a kind that would customarily not be released to the public by the person from whom it was obtained" in order to qualify as "confidential" for purposes of Exemption 4. 975 F.2d at 879. The inquiry is an objective one, and the agency bears the burden of establishing the provider's custom. *Id.* In this case, Defendant has met that burden. Eanes's initial declaration states that "Sandia routinely protects internal communications of this nature and would not release such material to the public." Def.'s Mot. at 7 (citing Initial Eanes Decl. ¶ 15); *see also* Initial Eanes Decl. ¶ 15 ("Records documenting . . . communications" between Sandia managers and Sandia legal counsel—the release of which "would damage . . . legitimate Sandia business interests"—and "the information they contain" "are maintained as confidential within Sandia using measures including storage in locked areas and repositories and exercising measures to restrict access to both electronic and hardcopy data materials."). Plaintiff offers no contrary evidence. Accordingly, the court finds that Defendant properly redacted the e-mails in question under the *Critical Mass* standard.

This holding, however, is subject to one exception: Defendant may not redact portions of the e-mails that it already disclosed in the OIG Report and the Memorandum to the Secretary. "[A]n agency waives its right to claim a FOIA exemption for information that it has officially released in the public domain." *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 849 F. Supp.

2d 47, 59 (D.D.C. 2012) (citing *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)); *cf. Niagara v. Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) (applying this logic to material withheld pursuant to Exemption 4). Indeed, a court may compel disclosure "even over an agency's otherwise valid exemption claim" "when information has been 'officially acknowledged'" through prior disclosure. *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). Here, the official acknowledgement standard is easily met. *See id.* (setting forth standard).

As noted above, Plaintiff challenges Defendant's redactions to two e-mail communications between Sandia managers and Sandia counsel: an e-mail from March 21, 2004, and an e-mail thread from May 20, 2010. As to the earlier e-mail chain, the Memorandum to the Secretary, which OIG published on its website, *see* Tr. 68, describes the exchange as follows:

> [T]he documentation confirms that Sandia's own Legal Counsel recognized in 2004 that as a Federally Funded Research and Development Center SNL was required to operate with objectivity and full disclosure to the sponsoring agency. When considering the question of whether a cost would be allowable when SNL assisted [Lockheed Martin] in matters of competition, the Legal Counsel warned that, *"Neither Sandia nor NNSA could tolerate even the suspicion that Sandia was assisting in the competition at prime contract expense."*

OIG Report at 12 (emphasis added). The OIG Report reveals even more about the March 21, 2004, e-mail thread:

> As early as March 21, 2004, SNL had considered the question of whether a cost would be allowable when SNL assisted [Lockheed Martin ("LMC")] in matters of competition. A March 21, 2004, e-mail from SNL Legal Counsel stated, that there was a tenuous benefit to SNL in merely assisting LMC in the acquisition of other business. Legal Counsel believed that segregating LMC "Business Development" from the "M&O of Sandia" would be appropriate. Legal Counsel stated: "Finally, I am recalling that as an FFRDC we operate with objectivity and with full disclosure to the sponsoring agency. Neither Sandia nor NNSA could tolerate even the suspicion

that Sandia was assisting in the competition at prime contract expense."

*Id.* at 27.  Plaintiff received the foregoing excerpts when Defendant produced the OIG Report.

After conducting an *in camera* review of the records in dispute, the court finds that the following statements contained in the March 21, 2004, e-mail chain are specific enough, and sufficiently match, the above-referenced portions of the Memorandum to the Secretary and the OIG Report and must be disclosed to Plaintiff: (1) "I think we have a classic question regarding whether and when a cost is allocable and allowable"; (2) "I would think there is tenuous benefit to SNL in merely assisting LM to acquire other business"; (3) "I think that segregating LM Business Development and B&P, distinct from M&O of Sandia, would be appropriate"; and (4) "Finally, I am recalling that as an FFRDC we operate with objectivity and with full disclosure to the sponsoring agency.  Neither Sandia nor NNSA could tolerate even the suspicion that Sandia was assisting in the competition at prime contract expense."  Defendant officially acknowledged these excerpts by disclosing them to Plaintiff in response to Plaintiff's FOIA request.  *Cf. Chesapeake Bay Found., Inc. v. U.S. Army Corps of Eng'rs*, 722 F. Supp. 2d 66, 72 (D.D.C. 2010) (holding that public domain exception applied to information previously disclosed by agency in its initial *Vaughn* index where such information was identical to information the agency sought to withhold). Defendant has waived its right to assert FOIA Exemption 4 to withhold these statements.  *Cf. Niagara*, 169 F.3d at 19; *Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*, 588 F. Supp. 2d 51, 57–58 (D.D.C. 2008).

OIG made similar official disclosures about the May 20, 2010, e-mail chain.  The Memorandum to the Secretary states the following about those communications:

> [OIG] located an email dated May 20, 2010, in which an SNL official wrote, "In terms of precedent, we used operating costs in the same way in securing the extensions in [1998] and 2003." This

official also stated that, "In 2003 there was a Sandia team formed to secure the extension and we worked closely with [Lockheed Martin]."

OIG Report at 12. The OIG Report says even more:

> In a May 20, 2010 e-mail from [REDACTED] to the SNL Legal Counsel, [REDACTED] stated that the LMC [REDACTED] of Washington Operations had called and asked if "Sandians" [Sandia employees] could work with LMC on the contract extension (meeting with NNSA, putting together strategies and contract terms). [REDACTED] told the SNL Legal Counsel that, "I told [REDACTED] yes, because there is no RFP, no competition, so we can work on [the] extension using our operating dollars." [REDACTED] asked SNL Legal Counsel for information that [REDACTED] could provide to the LMC [REDACTED] citing the law and contract provisions supporting the position that "no competition means operating dollars can be spent."
>
> The SNL Legal Counsel responded by providing the March 21, 2004 e-mail legal opinion. Legal Counsel noted that a normal part of contract management and administration was to engage with the Government customer regarding schedule as well as other revisions to the contract. Legal Counsel indicated that, "The cost of that activity is allowable."

*Id.* at 27. Thus, as with the March 2004 e-mail, Defendant has officially acknowledged through prior disclosure multiple parts of the May 2010 e-mail thread.

Again, after having conducted an *in camera* review of the May 2010 communication in question, the court finds that Defendant must release: (1) the entirety of the first e-mail, which is timestamped 12:01 p.m., with the exception of the last sentence of the first paragraph; (2) the first two sentences of the third paragraph in the second e-mail, which is timestamped 1:26 p.m., excluding the bulleted list; and (3) the second and third sentences of the first paragraph in the third e-mail, which is timestamped 4:27 p.m.[6]

---

[6] To be clear, the court does not hold that Defendant must disclose the names and other identifying information of persons mentioned in the e-mails, which were withheld on the basis of Exemptions 6 and 7(C). The court's holding below with respect to Defendant's invocation of Exemption 7(C), and its earlier Opinion with respect to Exemption 6, control the disclosure of such names.

In sum, the court agrees with Defendant that the two e-mail chains are properly characterized as confidential commercial information within the meaning of Exemption 4. Defendant cannot, however, rely on Exemption 4 to redact the above-mentioned portions of the e-mails that OIG officially acknowledged through release into the public domain. *Cf. Students Against Genocide v. Dep't of State*, 257 F.3d 828 (D.C. Cir. 2001) ("[W]hile the logic of FOIA postulates that an exemption can serve no purpose once information . . . becomes public, we must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before we find a waiver." (second alteration in original) (quoting *Cottone*, 193 F.3d at 555)).

### B.     Exemption 7(C)

The court next addresses whether Defendant properly withheld, pursuant to Exemption 7(C), names and other identifying information from responsive law enforcement records, consisting of work papers, e-mails, memoranda of inspection activity, and publicly available information. Def.'s Mot. at 8–12; Def.'s Stmt. of Facts ¶ 8. Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). To determine whether the release of information would constitute an "unwarranted invasion of personal privacy," the court must balance "the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992); *accord Am. Civil Liberties Union (ACLU) v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011).

In its earlier Opinion, the court held that Defendant's invocation of Exemption 7(C) fell short because Defendant had not made an "individualized assessment" of the public-private balancing as to the three categories of employees whose identifying information the agency withheld. *Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 81. The court allowed Defendant to conduct the balancing in the first instance and renew its motion. *Id.* Defendant has now done so. *See* Def.'s Mot. at 11–12; Def.'s Opp'n & Reply at 8–10. As before, Defendant invokes Exemption 7(C) to withhold names of three categories of individuals: (1) "individuals employed by Sandia National Laboratories ('SNL'), Sandia Corporation, . . . and Sandia Corporation's parent company, Lockheed Martin Corporation"; (2) "all DOE employees in pay grades GS-15 and below"; and (3) "witnesses and those who were interviewed during the course of the OIG inquiry." Def.'s Mot. at 9, 11. This type of categorical approach to withholding is proper under FOIA "so long as [the agency's] definitions of [the] relevant categories are sufficiently distinct to allow a court to determine whether specific claimed exemptions are properly applied." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1149–50 (D.C. Cir. 2015) (internal quotation mark omitted). The court finds no error here in Defendant's grouping of employees. *Cf. Citizens for Pub. Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 854 F.3d 675, 681–82 (D.C. Cir. 2017) [hereinafter *CREW II*]. Defendant further claims that it has conducted the public-private balancing under Exemption 7(C) and that its withholding of all names and identifying information is proper. *See* Def.'s Mot. at 9–12.

1. *Background Concerning Review and Production of Records*

Before the court turns to the merits of Defendant's invocation of Exemption 7(C) and its balancing of interests, some context is necessary with respect to the disclosures the agency already has made to Plaintiff. Upon receiving Plaintiff's FOIA request in 2014, OIG identified and

reviewed a total of 114 documents responsive to Plaintiff's request. Def.'s Stmt. of Facts ¶ 2. Of those documents, OIG ultimately released 71 documents either in part or in full and withheld two in their entirety. *Id.* ¶¶ 3, 7.[7] This set of documents included the aforementioned OIG Report and Memorandum to the Secretary, as well as other work product created by OIG as a part of its investigation into Sandia's lobbying activities. Tr. at 33–35. As to the other 41 documents found in its investigative file, OIG forwarded them to NNSA for review. Def.'s Stmt. of Facts ¶¶ 3, 7; *see* Tr. at 33–35. This set of documents included those records that NNSA received from Sandia pursuant to its request for records. Tr. at 33; *cf.* Pl.'s Initial Cross-Mot., Ex. C, ECF No. 30-5 (seven-day letter). NNSA, along with Sandia staff, reviewed and ultimately produced 39 documents with redactions. *Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 72 (citing Def.'s Second Mot. for Partial Summ. J. at 1–3).

OIG and NNSA took different approaches with respect to weighing the privacy interests of individuals whose names appear in the responsive documents. *See generally* Tr. at 27–47. OIG conducted an independent review of the documents that it eventually disclosed and concluded that all Sandia officials, regardless of rank or participation in the lobbying scheme, "ha[d] the same privacy interest that any other private citizen would have" under Exemption 7(C). *Id.* at 36:16-18. As a result, for example, OIG redacted the names of all Sandia employees appearing in the OIG Report. *See* Def.'s First Mot. for Partial Summ. J. at 14–15; Def.'s Mot., Suppl. Decl. of Adrienne Martin, ECF No. 41-1 [hereinafter Suppl. Martin Decl.], ¶ 7.

---

[7] The two documents withheld in their entirety by OIG were drafts of the OIG Report, which OIG withheld pursuant to Exemption 5. *See* Def.'s First Mot. for Partial Summ. J., Decl. of Adrienne Martin, ECF No. 22-1, ¶¶ 24–25. Plaintiffs, however, conceded the arguments raised by Defendant in its initial motion for summary judgment supporting the invocation of Exemption 5. *Ctr. for Public Integrity*, 234 F. Supp. 3d at 72 n.1; *see also id.* (reasoning that in the alternative, the court was "convinced, in light of the evidence submitted and controlling authority, that Defendant ha[d] carried its burden as to those records").

At oral argument, it became clear that, unlike OIG, NNSA did *not* withhold the names of all Sandia employees. Instead, it disclosed the names of certain "key management official[s]" at Sandia, because, according to NNSA, those officials contractually waived their privacy interests as a part of the DOE contract. *See* Tr. at 30–32, 36–37, 44. NNSA did review the documents in question under Exemption 6, but in NNSA's estimation Exemption 6 did not allow withholding the names of high-level Sandia officials. *See id.* at 27:25–28:5 ("[W]hen the NNSA did [its] analysis on Exemption 6 . . . [it] looked at . . . who were high-level managerial folks, and those names were actually released, the people making the decisions, the people in that capacity."); *see also* Def.'s Second Mot. for Partial Summ. J. at 26–27; *Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 81–82. With respect to timing, NNSA made its determination to disclose names *after* OIG had released its redacted records. Tr. at 62–63.

These disparate approaches, standing alone, are unremarkable. But herein lies the problem: Some of the documents that NNSA disclosed in full *without* names redacted were originally part of OIG's investigative file, *cf.* Tr. at 33–35; *id.* at 44:8-19, yet OIG cited those very documents its Report *with* names redacted. That one component of DOE disclosed the names of certain high-level Sandia officials in some documents, while another component did not, raises several questions, the answers to which are critical to framing the merits of this issue. First, as to those names NNSA disclosed, does the official acknowledgment doctrine operate to bar Defendant from invoking Exemption 7(C) to block the release of those same names as found in OIG's records? Second, if the official acknowledgment doctrine does not bar all invocations of Exemption 7(C) for a person whose name NNSA has released, what effect does NNSA's public disclosure have on the person's privacy interest in the Exemption 7(C) balancing? Finally, if a person whose name NNSA has disclosed retains some privacy interest in OIG's records, does that person's interest

vary depending on the document that NNSA has disclosed? Concrete examples will help flesh out the answers to these questions, but the court first turns to the law.

2. *Official Acknowledgment Doctrine*

In order for information to be considered "officially acknowledged," it must "match" the information previously disclosed," be "as specific as" such information, and it must have been "made public through an official and documented disclosure." *Fitzgibbon*, 911 F.2d at 765. An agency's release of records in response to a FOIA request qualifies as an official and documented disclosure. *See Chesapeake Bay Found.*, 722 F. Supp. 2d at 71–72 (holding that agency waived withholding of names when it disclosed them in its *Vaughn* index); *Hall v. Dep't of Justice*, 552 F. Supp. 2d 23, 30–31 (D.D.C. 2008) ("The court agrees that, to the extent that the non-redacted portions specifically identify the names of individuals in specific redacted portions of the documents, DOJ cannot redact these names."). Applying that principle here, however, involves a slight wrinkle. There can be little doubt that NNSA officially acknowledged the names of some high-ranking Sandia officials by releasing those names to Plaintiff in unredacted records. *See Hall*, 552 F. Supp. 2d at 30–31. But does NNSA's release of names foreclose OIG from redacting those same names from its disclosed material? Put more broadly, does official disclosure of a name by one agency component preclude another agency component from withholding the same name?

Circuit precedent addresses and answers the question. While "[d]isclosure by one federal agency does not waive another agency's right to assert a FOIA exemption," *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015), "[t]hat rule does not apply . . . where the disclosures are made by an authorized representative of the agency's parent," *Am. Civil Liberties Union (ACLU) v. CIA*, 710 F.3d 422, 429 n.7 (D.C. Cir. 2013). Moreover, official disclosure by one component binds another component of the same agency. So, for example, in *Marino v. Drug Enforcement*

*Administration*, the D.C. Circuit held that "a federal prosecutor's decision to release information at trial is enough to trigger the public domain exception where the FOIA request is directed to [the FBI,] another component *within* the Department of Justice." 685 F.3d 1076, 1082 (D.C. Cir. 2012) (citing *Davis*, 968 F.2d at 1279–82); *see id.* (applying this rationale to disallow a *Glomar* response by the DEA, another component within the DOJ, where a U.S. Attorney released documents); *see also Bartko v. U.S. Dep't of Justice*, 62 F. Supp. 3d 134, 143 (D.D.C. 2014) ("[T]he prosecutor's decision to acknowledge the investigation is 'enough to trigger the public domain exception,' as both [the prosecutor] and [the Office of Professional Responsibility] work for DOJ."); *cf. ACLU*, 710 F.3d at 429 n.7 (citing cases). Here, Defendant admits that both OIG and NNSA fall under the auspices of DOE. *See generally* Compl. ¶ 5 (alleging that both OIG and NNSA are "component agencies or offices of Defendant DOE," which had "possession of and control over the records that plaintiff seeks"); Answer ¶ 5 (admitting paragraph 5 of Complaint). Thus, NNSA's disclosures trigger an official acknowledgment waiver on behalf of other DOE subcomponents, including OIG.

A question remains, however, as to the *scope* of NNSA's official acknowledgment of a person's name. Does that acknowledgment extend to all OIG records containing the disclosed person's name, or does it apply only to OIG material that mirrors or is derived from the NNSA-produced document? An example is useful here. Take the May 20, 2010, e-mail chain discussed above. NNSA disclosed that record to Plaintiff with the name "Becky Krauss" appearing in the "To" or "From" lines in the component emails. *See* Notice of Filing of Exs. in Supp. of Def.'s Mot. for Partial Summ. J., ECF No. 27, Ex. H, ECF No. 27-7, at 1–2. OIG's Report discusses the May 20, 2010, e-mail chain, but when OIG produced the Report to Plaintiff it redacted the names of all senders and recipients of the emails, including presumably Becky Krauss. *See* OIG Report

at 27.  But application of the official acknowledgment doctrine precludes OIG from redacting Krauss's name in connection with its discussion of the May 20, 2010, e-mail chain.  The same is not true, however, for all other OIG records containing Krauss's name, including other references to Krauss that might be in the Report.  For there to be an official acknowledgment, the information disclosed must precisely "match" the information requested.  *See Fitzgibbon*, 911 F.2d at 765.  Thus, although NNSA officially acknowledged Krauss's name in connection with the May 20, 2010, e-mail chain, that acknowledgment does not extend to all other appearances of Krauss's name in OIG records.  *Cf. Wolf*, 473 F.3d at 373–74, 378–79 (disallowing *Glomar* response only as to those records read into the congressional record about a person, but permitting *Glomar* response as to all other responsive records in the agency's possession about the same person); *Hall*, 552 F. Supp. 2d at 31 (holding that official disclosure of names does warrant disclosure of other redacted information in the same record).  For example, if OIG interviewed Krauss and redacted her name in the Report when referring to her interview statements, Krauss's name has not been officially acknowledged as to that particular reference in the Report.  Thus, the official acknowledgment of a person's name is document specific.

So, if an unredacted document released by NNSA is directly discussed or quoted in a released OIG record, such as the OIG Report, then Defendant can no longer rely on Exemption 7(C) to protect the identity of persons who appear in both records.  Therefore, Defendant must produce to Plaintiffs any such OIG records without redacting such names.

### 3. *Balancing of Interests Under Exemption 7(C)*

Having established the circumstances in which the agency can no longer withhold names, the court turns to the Exemption 7(C) analysis.  Under this analysis, the court must balance the privacy interests of the individuals named in the documents against the public interest in

disclosure. As previously discussed, the parties' dispute over the application of Exemption 7(C) centers on whether Defendant may redact the names of three general categories of individuals: (1) high-level Sandia, SNL, and Lockheed Martin officials; (2) DOE employees who are at pay grades GS-15 or below; and (3) individuals who were interviewed during the OIG Inquiry. Furthermore, as indicated above, the dispute over the first category of names now contains an added wrinkle, given NNSA's and OIG's different approaches with respect to the names of high-level Sandia officials.

a.    High-Level SNL, Sandia, and Lockheed Martin Employees

With respect to the first category of names redacted by Defendant, the Supplemental Declaration of OIG Information Specialist Adrienne Martin clarifies that these individuals are "relatively high-level employees of SNL, Sandia Corporation, or Lockheed Martin Corporation, several of whom had concurrent positions in more than one of those entities." Suppl. Martin Decl. ¶¶ 1, 7. The employees falling within this category include not only those who advocated for Sandia "to charge the cost of lobbying activities to the contract with DOE for the operation of SNL," but also those who opposed that decision. *Id.* ¶ 7. According to Defendant, the "common element" uniting the advocates and opponents of the decision is that "none of the[m] . . . w[ere] determined [by OIG] to be [individually] culpable . . . for any misconduct" or "indicted for or convicted of any criminal activity." Def.'s Mot. at 10 (citing Suppl. Martin Decl. ¶ 7).

Before turning to the balancing of interests with respect to this category of individuals, the court raises but ultimately sets aside a threshold issue: For purposes of Exemption 7(C), should Sandia employees be treated as private citizens because they work for a private company, or are they more akin to government employees because they carry out a unique government function, i.e., operating a government-owned nuclear lab? That distinction is important because it dictates

the weight of the privacy interest at stake and the proper test to apply. To protect the substantial privacy interests recognized under Exemption 7(C), the D.C. Circuit has adopted a "categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991)); *accord CREW I*, 746 F.3d at 1094 (observing that the categorical rule announced in *SafeCard* applies to "the redaction of the names and identifying information of private citizens mentioned in law enforcement files"). Although the D.C. Circuit has made clear that the *SafeCard* categorical rule typically will operate to protect the names and identifying information of *private* citizens appearing in law enforcement records, *Schrecker*, 349 F.3d at 661,[8] the case law is less clear about the rule's application to government officials and employees, *compare Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007) (affirming agency decision to withhold private information regarding law enforcement officials and "other government employees" because plaintiff's "bare and undeveloped allegations would not warrant a belief by a reasonable person that impropriety might have occurred"), *with Schrecker*, 349 F.3d at 661 (noting that while "government officials do not surrender all rights to personal privacy when they accept a public appointment, [the court] ha[s] not had occasion to decide whether the *SafeCard* rule applies to *former* officials no longer in government service" (emphasis added)); *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996) (recognizing that the privacy interests of government officials are at least

---

[8] The categorical rule does not apply to private individuals who have been publicly implicated in a law enforcement investigation because such persons have "a diminished privacy interest in [the] certain information that may be contained in the records at issue." *CREW II*, 854 F.3d at 682; *cf. Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 876 F.3d 346, 350 (D.C. Cir. 2017) (recognizing that such individuals still retain significant privacy interests in the contents of the investigative files).

somewhat diminished). Thus, here, if Sandia officials are considered to be private individuals for purposes of Exemption 7(C), *Safecard*'s categorical rule applies; if, on the other hand, they are considered akin to government employees because they operate a government-owned nuclear lab, then *Safecard*'s categorical rule arguably moves aside in favor of an individualized balancing of the public-private interests, *see, e.g.*, *CREW II*, 854 F.3d at 682–83. The court need not, however, choose between the two here, for even if the court applies the less stringent individualized balancing test to this first category of employees, Plaintiff loses because in each instance a balancing of the employees' privacy interests outweigh the claimed public interest.[9]

On the privacy side of the balance, the privacy interests are substantial for every Sandia official and employee in this category. That privacy interest takes two forms. First, "individuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation." *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995). "That privacy interest also extends to third parties who may be mentioned in investigatory files, as well as to witnesses and informants who provided information during the course of an investigation." *Id.* The Circuit also recognizes "a second, distinct" type of privacy "interest in the *contents* of the investigative files." *CREW I*, 746 F.3d at 1092. Thus, even if a person's privacy interest is diminished because he is publicly associated with a law enforcement investigation, the person retains a "not insubstantial" privacy interest in the investigative files' contents. *See id.*

Here, there can be little doubt that each Sandia employee—even if treated on par with a government employee—possesses a substantial privacy interest in not having his or her name

---

[9] To be sure, the categorical rule would apply to Lockheed Martin employees not dually employed by Sandia or SNL, as those persons are only private individuals. *See* Tr. at 17. For ease of analysis, however, the court treats these "pure" Lockheed Martin employees as it does Sandia employees.

associated with a law enforcement investigation and in the investigative files' contents. *See Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 876 F.3d 346, 350 (D.C. Cir. 2017); *CREW II*, 854 F.3d at 683. That holds true irrespective of the person's role in the lobbying scheme. And it also obtains for those high-level Sandia officials whose names NNSA released as part of its production and who now arguably might be associated with proof of wrongdoing. No employee has been publicly identified by a law enforcement agency as having engaged in violating the law, let alone stood accused or convicted of an offense. As the Circuit observed in *CREW II*: "The privacy interests of individuals who have not been convicted in connection with this investigation—and even more so those who have not been publicly linked with the investigation whatsoever—differ greatly from those of individuals who were convicted or pled guilty for their roles." 854 F.3d at 683. To be sure, Sandia only can act through its agents or employees, and therefore *someone* must be responsible (though not necessarily in the legal sense) for the federal law violations. But the court is not aware of any case that diminishes a person's privacy interests simply because her employer, on account of the doctrine of respondeat superior liability, is held accountable for a law violation. Accordingly, all persons in this category possess a substantial privacy interest.

To overcome this privacy interest in favor of disclosure, Plaintiff must make two showings related to the public interest. First, it must demonstrate that "the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). The Supreme Court has made clear that "[t]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up

to.'" *U.S. Dep't of Defense v. FLRA*, 510 U.S. 487, 497 (1994) (third alteration in original) (quoting *Reporters Comm.*, 489 U.S. at 773); *accord CREW I*, 746 F.3d at 1093. Second, Plaintiff must show that "the information [sought] is likely to advance that interest." *Favish*, 541 U.S. at 172. The failure to make either showing renders the invasion of privacy unwarranted.

Here, Plaintiff relies upon two distinct public interests. First, Plaintiff asserts a public interest in understanding how the agency conducted its investigation, i.e., in learning whether OIG properly performed its duties as the investigative arm of DOE. *See* Tr. at 48, 52. Specifically, Plaintiff asserts that "Defendant has admitted that Sandia Corporation committed serious misconduct," and "[i]f, as Defendant maintains, it determined that every individual it investigated 'was *not* involved in any misconduct or culpable of any wrongdoing,' then there can be no conclusion other than its investigation was inadequate." Pl.'s Reply at 3 (internal citation omitted). Plaintiff therefore argues that, like in *CREW I*, the public has an interest in matters of "substantive law enforcement policy." 746 F.3d at 1093 (citation omitted). That is, "the relevant public interest is *not* to find out what [the Sandia officials] w[ere] 'up to' but rather how [DOE's OIG] carried out [its] . . . dut[y] to investigate" illegal conduct. *Id.*

The court disagrees. In *CREW I*, the Department of Justice explained that the requested records related to "a wide-ranging public corruption investigation as part of [the FBI's] ongoing efforts to root out systemic corruption within the highest levels of government," and the court found that disclosure of such records "would likely reveal much about . . . whether the government had the evidence but nevertheless pulled its punches." *Id.* (alteration in original and internal quotation marks omitted). By contrast, Plaintiff here does not explain how releasing the names of Sandia employees will get Plaintiff any closer to learning whether OIG pulled its punches or, for that matter, anything else about the investigation. Defendant already has released the final OIG

Report and relevant investigative records. That release offers Plaintiff a bounty of information about OIG's investigation, including the categories of witnesses it interviewed, the documents it reviewed, how it weighed the evidence, and the conclusions it drew. In view of that release, the public interest in evaluating the OIG inquiry is "greatly reduced." *Cf. Judicial Watch*, 876 F.3d at 350 (finding the "weighty public interest in evaluating government investigations of public officials" was "greatly reduced" where there was "voluminous information already in the public domain about the . . . investigation" and "[t]he political branches of the federal government ha[d] assessed the evidence and documented their proceedings and findings in publicly available reports" (internal quotation marks omitted)).

Arguably, the release of names might enable Plaintiff to determine if any specific individual escaped public scrutiny for an improper purpose. But the mere prospect of doing so is not enough to overcome the employees' substantial privacy interests. *See Favish*, 541 U.S. at 174 (stating that "[w]here the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure"). Here, Plaintiff has offered no reason to suspect that OIG purposely gave Sandia employees responsible for the lobbying scheme a free pass. Indeed, Plaintiff has not even given the court reason to believe that OIG's mandate required it to make findings of individual culpability. *See* Tr. at 52–54. Plaintiff's mere conjecture about what the names *might* reveal cannot outweigh those persons' substantial privacy interests. *See Favish*, 541 U.S. at 174; *Lewis v. U.S. Dep't of Justice*, No. 09-5225, 2010 WL 1632835, at *1 (D.C. Cir. Apr. 7, 2010).

The second public interest that Plaintiff advances—to ensure that those who engaged in wrongdoing are held accountable and are not in a position to do it again—is equally unavailing.

Tr. at 48; *see also* Pl.'s Cross-Mot. & Opp'n at 10; Pl.'s Reply at 3. The D.C. Circuit has held that, under certain circumstances, the public has a distinct interest "in knowing *who* the public servants are that were involved in [a] governmental wrongdoing, in order to hold the governors accountable to the governed." *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984); *see also Prison Legal News*, 787 F.3d at 1151. But that interest gains little traction here for two reasons. First, since *Stern*, the Circuit has circumscribed that interest to the exceptional case that captures widespread public attention. *See Beck v. U.S. Dep't of Justice*, 997 F.2d 1489, 1493 (D.C. Cir. 1993). In this case, although Sandia's misdeeds became public, they hardly qualify as a "well-publicized scandal" that captured the public's attention. Second, Lockheed Martin and Sandia are no longer running SNL, having lost the contract as of 2017. *See* Tr. at 49, 56. Thus, those involved in the lobbying scheme are likely no longer in a position to misuse taxpayer money, and Plaintiff has got given the court reason to think otherwise. The public interest in "hold[ing] the governors accountable to the governed" is therefore diminished.

In the end, whatever public interest there is in learning the identities of the persons involved in Sandia's lobbying efforts, that interest is not outweighed by those persons' substantial privacy interests. Accordingly, Defendant properly invoked Exemption 7(C) to withhold the names of Sandia, SNL, and Lockheed Martin employees from disclosure, subject to the court's official acknowledgment holding above.

b.      DOE Employees Who Serve at the GS-15 Level and Below

Defendant also redacted the names of "all DOE employees in pay grades GS-15 and below" from the responsive records. Suppl. Martin Decl. ¶ 9. According to Defendant, most of these employees are either OIG investigators or employees at DOE headquarters or field offices who

shared background information with investigators. *Id.* "None of the Federal employees" in this category "was alleged to have been involved in any misconduct or wrongdoing of any kind." *Id.*

The court "need not linger over the balance" as to these employees. *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989). Plaintiff disclaims its demand to learn the names of OIG investigators. *See* Pl.'s Cross-Mot. & Opp'n at 8. For the remaining employees, there can be little doubt that these individuals have a "substantial" privacy interest in avoiding disclosure of their names. *See Schrecker*, 349 F.3d at 666. The only public interest Plaintiff claims is that "the names of the other [non-investigative] employees are important in understanding the significance of the information they provided." Pl.'s Mot. at 8. It is not at all clear what Plaintiff means by this, but in any event it is not an interest that reveals "what [the] government is up to." *Reporters Comm.*, 489 U.S. at 773. In the end, "something, even a modest privacy interest, outweighs nothing every time." *Nat'l Ass'n of Retired Fed. Emps.*, 879 F.2d at 879.

c.    Individuals Interviewed During the OIG Inquiry

Finally, Defendant redacted the names of "those who were interviewed during the course of the OIG inquiry." Suppl. Martin Decl. ¶ 11. These individuals fall into two camps. The first consists of DOE officials at various levels, none of whom are alleged to have been involved in any misconduct or wrongdoing of any kind. *Id.* ¶ 12. The second consists of high-level "SNL, Sandia Corporation, and Lockheed Martin Corporation" employees, both advocates and opponents of the Sandia decision, who were interviewed by OIG "regarding the decision to charge lobbying expenses to the SNL contract." *Id.* Given the substantial overlap between this third category of individuals and the first and second categories, the non-disclosure of the names of these individuals was proper for the reasons already discussed. Moreover, to the extent there are any individuals who fall within this third category but do not fall within the first or second categories, Plaintiff

does not address why disclosure of these names is warranted under the balancing test. *Cf.* Pl.'s Cross-Mot. & Opp'n at 9. Accordingly, Defendant properly withheld these names, too, under Exemption 7(C).

### C. Segregability

Finally, the court addresses Defendant's segregability determination. A district court must evaluate segregability even where, as here, the requester has not challenged it. *See Sussman*, 494 F.3d at 1116. Because "[t]he focus of FOIA is information, not documents . . . an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). FOIA therefore requires that "[a]ny reasonably segregable portion of [the] record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). An agency must provide a "detailed justification" and not just make "conclusory statements" to support its segregability determination. *Mead Data Cent.*, 566 F.2d at 261. Agencies, however, "are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which can be overcome by contrary evidence produced by the requester. *Sussman*, 494 F.3d at 1117.

In its previous Opinion, the court found Defendant had not sufficiently justified its segregability determination with respect to documents that were properly withheld pursuant to Exemptions 3, 4, 6, 7(E), and 7(F), and directed Defendant to "provide a sufficiently 'detailed justification'" regarding this determination. *Ctr. for Pub. Integrity*, 234 F. Supp. 3d at 83 n.5, 84. Defendant has now done so. The court has reviewed the Supplemental Hamblen Declaration and the Martin Declaration and is satisfied that Defendant has carried out its duty to disclose reasonably segregable material. *See* Def.'s Mot., Suppl. Decl. of Christina Hamblen, ECF No. 41-3, ¶¶ 8–

16; Def.'s First Mot. for Partial Summ. J., Decl. of Adrienne Martin, ECF No. 22-1, ¶¶ 15–16, 26; *see also* Suppl. Martin Decl. (elaborating on the three categories of names withheld in the responsive records).

## V. CONCLUSION

For the reasons set forth above, Defendant's Renewed Motion for Summary Judgment is granted in part and denied in part, and Plaintiff's Renewed Cross-Motion for Summary Judgment is granted in part and denied in part.

A separate Order accompanies this Memorandum Opinion.

Dated:  January 12, 2018

Amit P. Mehta
United States District Judge